## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF KANSAS

## AT KANSAS CITY

| | |
|---|---|
| TERRI PAGANO, Derivatively On Behalf of SPRINT NEXTEL CORPORATION, | X : : |
| Plaintiff, | : : |
| | : **NO.  12-cv-2242 JTM/KGG** |
| vs. | : : |
| | : **JURY TRIAL DEMANDED** |
| ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, JAMES H. HANCE, JR., DANIEL R. HESSE, V. JANET HILL, FRANK IANNA, SVEN-CHRISTER NILSSON, WILLIAM R. NUTI, and RODNEY O'NEAL, | : : : : : |
| Defendants, | : |
| - and - | : : |
| SPRINT NEXTEL CORPORATION, | : : : |
| Nominal Defendant. | : : X |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Terri Pagano ("Plaintiff") alleges the following upon personal knowledge as to herself, and upon information and belief as to all other allegations, based upon her attorneys' investigation of the claims herein alleged, including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, press releases, media stories, information from the Taxpayer Protection Bureau of the Office of the New York Attorney General, and the Superseding Complaint filed in *State of New York, ex rel. Empire State Ventures, LLC v. Sprint Nextel Corporation*, No. 103917-2011 (N.Y. Sup. Ct. N.Y. Cnty.) (the "qui tam Complaint"):

## <u>SUMMARY OF THE ACTION</u>

1.  This is a shareholder derivative action brought pursuant to Federal Rule of Civil Procedure 23.1 on behalf of nominal defendant Sprint Nextel Corporation ("Sprint" or the "Company") by one of its shareholders, arising out of the Company's illegal tax evasion. It is brought against the current members of the Company's Board of Directors (the "Board") (collectively, with the Company, the "Defendants"), for breaching their fiduciary duties owed to Sprint from July 2005 through the present (the "Relevant Period") by: (i) allowing Sprint to participate in a scheme to engage in improper, wrongful, and illegal tax evasion; (ii) failing to properly oversee or implement procedures to detect and prevent such improper, wrongful and illegal practices; (iii) causing or recklessly failing to prevent Sprint from issuing false and misleading statements concerning Sprint's net income, net earnings, churn rate, tax liability, and other key financial information; and (iv) exposing Sprint to potential civil liability and fines of $300 million or more.

2.  Sprint is a mobile telecommunications service provider incorporated in Kansas.

3.  Beginning around July 2005, Sprint and the Board knowingly and fraudulently failed to collect and pay more than $100 million in New York sales taxes on receipts from its sale of wireless telephone services.

4.  On or about March 31, 2011, a whistleblower, or *qui tam* plaintiff, Empire State Ventures, LLC filed an action in the New York Supreme Court under the New York False Claims Act alleging that Sprint illegally avoided its New York sales tax obligations on about 25% of its receipts for "flat-rate" calling plans – plans for which customers pay a fixed monthly charge for a set or unlimited amount of calling time.

5.      As discussed in more detail below, New York unequivocally imposes sales taxes on the entire amount of fixed monthly charges for wireless voice services.

6.      After an investigation, the New York Attorney General notified the New York Supreme Court on April 19, 2012, of its decision to supersede the *qui tam* plaintiff's complaint with the filing of a superseding complaint (attached hereto as Exhibit A).

7.      Sprint and the Board had actual knowledge that the Company was required to collect and pay New York sales taxes on the full amount of these fixed monthly charges, yet the Defendants chose to act contrary to the law to advance the Company's own competitive interests and has repeatedly and knowingly submitted false records and statements to New York State. The Defendants caused, or were reckless in allowing, the Company to falsely assert on the Company's sales tax filings that Sprint owed less in sales taxes than it really did. Each of these statements and records was material to Sprint's sales tax obligations. Sprint owed substantially more than it reported.

8.      The Defendants' decision to not collect and pay the required sales taxes in New York arose out of a nationwide scheme to gain an advantage over the Company's competitor wireless carriers by failing to collect and pay sales taxes, thereby reducing the cost of its products to its customers.

9.      Defendants caused, or were reckless in allowing, the Company to conceal this scheme from taxing authorities, the Company competitors, and its customers.

10.     Even after New York tax authorities instructed Sprint that its tax avoidance scheme was illegal, Defendants not only failed to pay the back taxes it owed, but continued to underpay sales taxes and submit false tax returns.

11.     Under the New York False Claims Act, the Attorney General's lawsuit requires Sprint to pay three times its underpayment of over $100 million, plus penalties if found liable, thus exposing Sprint to over $300 million in liability.

12.     As alleged herein, the Board's continuous and sustained actions and inactions during the seven-year period of illegal tax evasion, and their utter failure to cause Sprint and its senior executive officers to halt the illegal and improper tax evasion, has caused significant injury and damage to Sprint by subjecting the Company to over $300 million in liability.

13.     The Board caused and/or permitted Sprint to engage in the scheme to avoid the Company's tax obligations, despite their knowledge that the tax evasion was illegal and that such action subjected Sprint to substantial monetary fines and liability.

14.     The members of the Board are charged with fiduciary duties of care, loyalty, and good faith to the Company.  By participating and/or acquiescing in this tax evasion Defendants breached these duties to the Company by exposing it to substantial monetary fines and liability.

15.     Defendants' participation, acquiescence, or failure to prevent the Company's tax evasion was a breach of their fiduciary duties to the Company and exposed Sprint to liability and business risks.  Further, the egregious acts complained of herein constitute violations of law and breaches of the fiduciary duties owed by the Individual Defendants and could never be the product of sound business judgment, thereby constituting bad faith.

16.     Importantly, the Company has not announced any internal investigation, suspension or firing of responsible employees or even the creation of a special committee to investigate the wrongful, improper or illegal activity.  As described in more detail herein, this tepid response to the Attorney General's investigation along with, among other things, the nature

of the wrongdoing engaged in by the Company, demonstrates that demand on the Company's Board to take action would be futile.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under and pursuant to 28 U.S.C. § 1332(a) because this action is an action for, *inter alia*, damages in excess of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship.

18.    This action is not a collusive one to confer jurisdiction on a Court of the United States that it would not otherwise have.

19.    Venue is proper in this Court because the Company is headquartered in this County and certain of the Individual Defendants engaged in acts of wrongdoing in this County.

## THE PARTIES

20.    Plaintiff Terri Pagano is an owner and holder of Sprint common stock.

21.    Nominal defendant Sprint Nextel Corporation is a mobile telecommunications service provider that does business nationally and internationally. Sprint currently has about 55 million customers, including about 1.82 million wireless customers in New York State, and annual revenues of approximately $33 billion. Sprint Nextel Corporation is incorporated in the State of Kansas, with a principal executive office located at 6200 Sprint Parkway, Overland Park, Kansas 66251.  Sprint Nextel Corporation is registered to be traded on the New York Stock Exchange.

22.    Defendant Robert R. Bennett ("Bennett") has served as a Sprint director since October 2006. He is a member of Audit and Executive Committees, and Chair of the Finance Committee, and an Audit Committee Financial Expert.  Bennett is a resident of Colorado.

23.    Defendant Gordon M. Bethune ("Bethune") has served as a Sprint director since March 2004.  He is a member of the executive committee and of the Nominating & Corporate

Governance Committee, and is the Chair of the Compensation committee.  Bethune is a resident of Texas.

24.     Defendant Larry C. Glasscock ("Glasscock") has served as a Sprint director since August 2007.  He is a member of the executive and finance committees, Chair of the Audit Committee, and an Audit Committee Financial Expert. Glasscock is a resident of Indiana.

25.     Defendant James H. Hance, Jr. ("Hance") is Chairman of the Sprint Board and has served as a Sprint director since February 2005.  He is a member of the Audit, Executive, and Finance Committees and is an Audit Committee Financial Expert.  Hance is a resident of New York.

26.     Defendant Daniel R. Hesse ("Hesse") has been the President and Chief Executive Officer of Sprint since December 17, 2007.  He has been a Sprint director since December 2007 and he is the Chair of Executive Committee.  Hesse is a resident of Missouri.

27.      Defendant V. Janet Hill ("Hill") served as a director of Nextel Communications, Inc. from November 1999 until its merger with Sprint Corporation in August 2005, and she has been a Sprint director since 2005.  She is a member of the compensation and executive committees, and is the chair of the Nominating & Corporate Governance Committee.  Hill is a resident of Virginia.

28.     Defendant Frank Ianna ("Ianna") has been a Sprint director since March 2009. He is a Member of the Audit Committee and of the Nominating & Corporate Governance Committee.  Ianna is a resident of New Jersey.

29.     Defendant Sven-Christer Nilsson ("Nilsson") has been a Sprint director since November 2008. He is a member of the Nominating & Corporate Governance Committee. Nilsson is a resident of Sweden.

30.     Defendant William R. Nuti ("Nuti") has been a Sprint director since June 2008. He is a member of the compensation and finance committees. Nuti is a resident of New York.

31.     Defendant Rodney O'Neal ("O'Neal") has been a Sprint director since August 2007. He is a member of the compensation committee and of the Nominating & Corporate Governance Committee. O'Neal is a resident of Michigan.

32.     The defendants identified in ¶¶ 22-31 constituted the Sprint Board, at all relevant times alleged herein, and are collectively referred to herein as the "Individual Defendants."

33.     The Individual Defendants owed the Company the duty to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of Sprint, including conducting its business in an ethical and legal manner.  The conduct of Sprint's directors complained of herein involves a knowing or reckless violation of their obligations as directors of Sprint, which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

34.     The officers and directors of Sprint were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company and the actions of its employees.  The officers and directors of Sprint were required, among other things:

        a.     To, in good faith, manage, conduct, supervise and direct the business and affairs of Sprint carefully and prudently and in accordance with state laws, the laws of the United States, and ethical business obligations;

        b.     To neither violate nor permit any other director, officer or employee of Sprint to violate applicable federal and state laws, rules and regulations or any rule or regulation of Sprint;

c.    To remain informed as to the status of Sprint's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make proper disclosures;

d.    To supervise the preparation, filing and/or dissemination of public filings, press releases, audits, reports or other information required by law, to examine and evaluate any reports or examinations, audits, or other financial information concerning the financial condition of Sprint;

e.    To cause Sprint to obey and comply with and not violate applicable laws, rules, regulations and its own ethical guidelines;

f.    To ensure that Sprint was operated in a diligent, honest and prudent manner in compliance with all applicable federal and state laws, rules and regulations; and

g.    To maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of Sprint would make false statements about Sprint to the securities markets or to government agencies.

35.    The Individual Defendants, as directors, owed Sprint the duties of due care and loyalty in the performance of their responsibilities with respect to Sprint's operations.  Each Individual Defendant in this action, individually or jointly, as alleged herein, breached their fiduciary duties to the Company by participating in and/or acquiescing in the scheme to avoid tax obligations, failed to exercise reasonable diligence and due care, was grossly negligent or reckless, and committed one or more of the following actions or omissions constituting mismanagement and breaches of fiduciary duty:

a. Defendants permitted Sprint to participate in improper and illegal tax avoidance, exposing the Company to severe legal and financial consequences; and

b. Defendants permitted Sprint to conduct its business in an unsafe, imprudent and dangerous manner by pursuing unsound practices, including concealing its reckless, unsafe and unsound practices and the serious adverse impact of these practices.

36. By reason of their corporate positions and their ability to control the business and corporate affairs of Sprint, Individual Defendants owed Sprint fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control Sprint in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Sprint and not in furtherance of their personal interests. In addition, each director owed Sprint the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of Sprint and in the use and preservation of its property and assets. The Board failed to maintain adequate internal controls to detect and prevent the improper collection and payment of taxes and other wrongful and improper conduct in violation of their fiduciary duties. Individual Defendants, in breach of their fiduciary duties, permitted and/or caused Sprint to conduct its business in an unsafe, imprudent and dangerous manner by engaging in illegal tax avoidance with potentially significant financial harm to the Company.

37. The Individual Defendants participated or failed to prevent the wrongdoing complained of herein, which caused the exposure of the Company to potential liability. Such participation involved, among other things, planning and creating (or permitting to be planned and created), and authorizing, approving and acquiescing in the conduct complained of herein. The alleged acts of wrongdoing violated relevant laws, rules and regulations and subjected Sprint to unreasonable risks.

38.     By reason of their membership on the Board and/or positions as executive officers of the Company, the Individual Defendants were each controlling persons of Sprint and had the power and influence to cause or prevent, and did cause or failed to prevent, Sprint to engage in and/or permit the conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS[1]

### Background of Sprint and the Company's Wireless Calling Plans

39.     Sprint is the third largest wireless communications company in the United States based on wireless revenue, one of the largest providers of long distance services, and one of the largest carriers of Internet traffic in the nation.  Sprint has subscribers in all 50 states, Puerto Rico, and the U.S. Virgin Islands and competes with a number of wireless carriers, including three other national wireless companies: AT&T, Verizon Wireless (Verizon) and T-Mobile.

40.     The Company's 2011 Form 10-K annual report states, in pertinent part,

> Our ability to effectively compete in the wireless business is dependent upon our ability to retain existing and attract new subscribers in an increasingly competitive marketplace. See Item 1A, "Risk Factors—If we are not able to retain and attract wireless subscribers, our financial performance will be impaired."

41.     The Sprint corporate brand includes plans sold under the retail brands of Sprint®, Nextel®, Boost Mobile®, Virgin Mobile®, and Assurance Wireless.

42.     Throughout the period from July 2005 to the present, Sprint has offered for sale to customers wireless calling plans that include voice services for a set number of minutes, or for an unlimited number of minutes, in exchange for fixed monthly charges.

43.     The fixed monthly charge for these voice services is billed to customers regardless of whether the customers actually use the network during the month, regardless of how much they use the available minutes, and regardless of whether calls are made to people or

---

[1] Allegations are substantially based on the *qui tam* complaint attached as Exhibit A.

phones within the same state – intrastate calls – or people or phones in other states – interstate calls. Under these plans, calls within the monthly number of minutes are not billed on a perminute basis.

44.    The fixed monthly charges that Sprint's customers pay for wireless voice services under Sprint's flat-rate plans are for access, not for specific calls; hence Sprint identifies these charges on customer invoices as "monthly recurring access charges."

45.    Sprint's customers typically purchase flat-rate calling plans by signing a contract with Sprint. Sprint represents in its contracts and on its website that it will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government.  For example, the Sprint website page entitled "Know about surcharges, taxes, fees and other charges" states: "States, counties, cities, and special taxing districts may assess various taxes on wireless communication services and/or the sales and rentals of wireless phones. Applicable taxes are collected by Sprint and remitted to the jurisdiction that is assessing the tax."

**<u>Sprint's Obligation to Pay New York Sales Taxes on Its Flat-Rate Calling Plans</u>**

46.    As explained in the *qui tam* complaint, since at least August of 2002, New York State and localities within New York State require and have required the payment of sales taxes on the full amount of fixed monthly charges for wireless voice services sold to customers in New York.  Sprint, as the provider of the services, is required to collect the sales taxes from its customers and pay them to the State.

47.    New York Tax Law contains a specific provision concerning how sales taxes are to be applied to fixed monthly charges for wireless voice services. According to N.Y. Tax Law Section 1105(b)(2), sales taxes are to be applied to:

> the receipts from every sale of mobile telecommunications services provided by a home service provider, other than sales for resale, that are

voice services, or any other services that are taxable under subparagraph (B) of paragraph one of this subdivision, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.

This provision has been in effect continuously since August 2, 2002.

48.     The Tax Law, and this section in particular, clearly requires the payment of sales taxes on the full amount of fixed periodic charges for wireless voice services sold by companies like Sprint to New York customers, as follows:

    a. Sprint is a "home service provider" because it is a facilities-based carrier with which mobile telecommunications customers contract for the provision of mobile telecommunications service.

    b. The mobile telecommunications services sold by Sprint under the flat-rate plans are not sold for resale.

    c. Under Sprint's flat-rate plans, Sprint sells wireless voice services for a fixed periodic charge.

    d. Sprint does not separately state or otherwise break out any portions of the fixed periodic charge for voice services in invoices or other communications with customers.

49.     Sprint's fixed monthly charges for wireless voice services are not for "other services that are taxable under subparagraph (B) of paragraph one of [Section 1105(b)]."

50.     On July 30, 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M"). There, it explained that for mobile telecommunications, "the total charge for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2)."

51.     The 2002 TSB-M gave a concrete example demonstrating that the amended law requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how – or whether – a customer uses them:

    Example 1: Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a flat-rate charge of

$49.95 per month. The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan. In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month. Such charge is subject to sales tax under section 1105(b)(2) of the Tax Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls. (2002 TSB-M at 3).

52.     The various counties within the State of New York, along with New York City and certain school districts and other local entities, impose sales taxes on the identical services. The sales tax rate imposed on such services varies by locality, and the taxes in each must be paid in addition to the New York State sales taxes.

53.     Under New York sales tax law, the obligations are different with respect to certain telecommunications services that are not sold for a fixed periodic charge. For overage minutes that are charged to customers on a per-minute usage basis, Sprint and other wireless carriers are required to collect and pay New York state and local sales taxes only when such calls are intrastate, and are not required to collect and pay them on such calls that are interstate.

54.     The New York Tax Department's 2002 TSB-M guidance further illustrated this situation in its next example:

> Example 2: The facts are the same as in Example 1, except that Mr. Smith exceeds the calling minutes allowed under the plan. The $49.95 flat-rate charge is subject to tax under section 1105(b)(2) of the Tax Law, and the separate charges for intrastate calls included in the excess minutes are subject to sales tax under section 1105(b)(1)(B) of the Tax Law. The separate charges for interstate or international calls included in the excess minutes  are not subject to sales tax. (2002 TSB-M at 3-4).

55.     The *qui tam* complaint further explains the New York tax law approach to bundling services where some of the services included in the bundle would be taxable if they were sold separately from the bundle (such as voice services sold for a fixed periodic charge), while other services would not be taxable if they were sold separately from the bundle (such as Internet services).

56.     If any one component service included in a bundle is subject to sales taxes when sold on its own, then the charge for the entire bundle is subject to sales taxes.  However, New York tax law allows a wireless carrier, in defined situations, to break out from the bundle, or "unbundle," the charge so it does not have to collect and pay sales tax on a charge for a service that would not be subject to sales tax if it were sold separately and not as a component of a bundle of services. This unbundling is also referred to as "component taxation."

57.     The *qui tam* complaint provides the example of Sprint's $39.99 flat-rate plan for access to Sprint's wireless network for 450 minutes of calling time.  For an additional $30, the customer can include unlimited internet access in the plan. The plan thus consists of two components: wireless voice services and internet access. Because a charge for internet access is not, on its own, subject to New York state and local sales taxes, Sprint is permitted to unbundle the internet portion of the overall charge and not collect and pay sales taxes on that internet portion.

58.     New York's unbundling rules are set forth in section 1111(l) of the New York Tax Law.  Under that section, wireless providers are permitted to treat separately for sales tax purposes certain components of a bundled charge for mobile telecommunication services, so long as the charges are not for voice services, and so long as service provider uses an "objective, reasonable and verifiable standard for identifying each of the components" of a bundled charge.

59.     The New York Tax Department's 2002 TSB-M guidance also illustrated this situation with examples:

> Example 7: Mrs. Johnson's place of primary use is an address in Buffalo, NY. She receives both cellular telephone service and Internet access service from her home service provider. The home service provider separately states the charge on Mrs. Johnson's bill for the cellular service and for the Internet access service. The charge for the cellular service is

subject to sales tax, while the charge for Internet access service (so long as reasonable) is not, because it is separately stated.

Example 8: The facts are the same as in Example 7, but the charges for the cellular service and the Internet access service are not separately stated. In this instance, the total charge is considered a receipt from the charge for mobile telecommunications service and is subject to sales tax, under section 1105(b)(2).

Example 9: The facts are the same as in Example 8, except the home service provider properly identifies, accounts for, and quantifies the receipts from each of the components of the total charge attributable to the cellular service and the Internet access service based on objective, reasonable and verifiable standards. In this instance, the home service provider is only required to collect and pay over sales tax that is attributable to the receipts associated with the cellular service. The portion of the receipt attributable to the Internet access service is excluded from taxation. (2002 TSB-M at 3-4).

60.     Unbundling cannot be used to avoid sales tax on a component service that the state or local government has chosen to tax; it can only be used to separate non-taxable services from taxable ones. A wireless carrier cannot, under the guise of unbundling, avoid sales tax on a taxable service. Because New York law treats fixed monthly charges for wireless voice services as a single, irreducible, taxable service that cannot be broken out for sales tax purposes, Sprint violated the law by failing to collect and pay New York state and local sales taxes on the full amount of the charges.

**Sprint's Scheme to Avoid Taxes Begins in 2005**

61.     As alleged in the *qui tam* complaint, beginning in July 2005, Defendants caused, or were reckless in allowing, the Company to begin to implement a nationwide program of unbundling its wireless offerings for sales tax purposes. As part of this program, Defendants caused, or were reckless in allowing, the Company to begin treating part of its fixed monthly access charges for wireless voice services as if they were charges for "interstate" calls charged on a per-minute basis, and, in states like New York, not collecting and paying sales taxes on that part.

15

62.     According to the whistleblower information, Sprint internally acknowledged that its approach to unbundling in this way was aggressive and risky because tax authorities throughout the country could object to the practice.

63.     Moreover, under New York law, Sprint's approach was and is unequivocally illegal.

64.     According to the *qui tam* complaint, Sprint began to consider unbundling its flat-rate plans that included wireless voice services before 2002.  Responsibility for implementing the plan fell to Sprint's business unit called the State and Local Tax Group.

65.     One approach, which Sprint identified as "conservative," involved unbundling only internet access from voice services. This was the approach to component taxation that Sprint understood some of its competitors were pursuing.

66.     Another approach, which Sprint viewed as aggressive and risky, and which would allow Sprint to be a "low cost tax leader in the wireless industry," involved unbundling "interstate usage" from within its fixed monthly charge for wireless voice services. Because the fixed monthly charge is not divisible based on customer usage, unbundling in this way required Sprint to come up with an arbitrary method of allocating the charge into sub-parts.

67.     At the time Sprint was considering these approaches to component taxation, the majority of Sprint's revenue from its wireless plans was coming from its fixed monthly charges for wireless voice services. Treating some portion of these charges as "interstate usage" presented the greatest opportunity for Sprint to reduce its collection of taxes, and improve its competitive standing nationwide because many states, including New York, do not charge sales taxes on receipts from charges for interstate calls billed on a per-minute basis.

68.    An internal Sprint analysis from January 2005 showed that, if Sprint unbundled only its internet access charges, it would reduce sales taxes by about $623,000 per month. The analysis further revealed that if Sprint also broke out charges for wireless voice services into what it deemed taxable and non-taxable categories, it would reduce sales taxes by an additional $4.6 million per month.

69.    Sprint concluded that its plans would be about $4.6 million per month cheaper, collectively, than competitors' plans by paying less money to the government, without any cost to Sprint.

70.    In early 2005, Sprint's Assistant Vice President of State and Local Tax, its Director of External Tax, and other Sprint employees met and decided to recommend to more senior Sprint executives that the company adopt the aggressive approach to unbundling that included breaking out its fixed monthly charge for wireless voice services and treating part of the charge as if it were for interstate usage billable on a per-minute basis.

71.    The senior executives authorized that approach.

72.    Defendants caused, or were reckless in allowing, the Company to decide to break out the Company's fixed monthly charges for voice services before it completed the merger with Nextel Corporation in August of 2005.  After the merger was complete, Sprint used the same approach to unbundling plans sold by Nextel.

73.    As well as artificially lowering tax expenses, a quantitative impact of the tax avoidance scheme is "decreas[ing] churn," and a key benefit is "lower churn."  "Churn" is a measure used within the telecom industry to refer to the loss of subscribers.  A low churn rate is favorable to a wireless carrier.  Sprint and other telecom carriers publicly disclose their churn

rates, and analysts and investors closely monitor churn.  Sprint incentivizes its employees to lower churn by increasing employee bonuses when Sprint's churn rate declines.

**Defendants Classify Arbitrary Percentages of the Fixed Monthly Charges as Non-Taxable**

74.    The *qui tam* complaint describes how Defendants caused, or were reckless in allowing, the Company to illegally re-classified percentages of the fixed monthly charges as non-taxable.

75.    To generate its customer invoices and to create its sales tax filings, Sprint utilized a data system which allowed Sprint to break out its charges into various taxing categories, and contains settings that will cause the system to treat charges placed in a category as "taxable" or "non-taxable" for any given taxing jurisdiction.

76.    Prior to unbundling its wireless calling plans, Sprint classified the full amount of its fixed monthly access charges for wireless voice services as "network access." "Network access" is defined in the system's reference manual as "a charge to have access to a cellular or paging network." Sprint's fixed monthly charges for wireless voice services were just such charges.

77.    Once Sprint began its unbundling program, Defendants caused, or were reckless in allowing, the Company to manipulate the system by classifying part of the charge as being in a category called "usage airtime: interstate," which was set up and used by Sprint to be nontaxable in New York.

78.    The taxing system's vendor considered charges for "usage airtime: interstate" (as the system defined it) to be non-taxable for purposes of New York state and local sales taxes and set up the system to capture per-minute usage charges – such as overage charges – that were for interstate calls.  Defendants knew of that non-taxable setting and did not change it, even though they knew that it was not using this category for its intended purpose.

18

79.     Moreover, the percentage figures that Sprint used in dividing up its fixed monthly charges for wireless voice services between the "network access" and "usage airtime: interstate" categories varied by calling plan and over time in an arbitrary and inconsistent manner.

80.     At times, for example, Sprint calculated a percentage for "interstate usage" from an unrelated federal telecommunications surcharge, but Sprint did not use that same percentage in calculating its obligations for that federal surcharge, nor did Sprint modify how it allocated its charges for sales tax purposes when the federal government changed the percentage.

81.     As a result of this improper reclassification, Defendants caused, or were reckless in allowing, Sprint to not collect and pay state and local sales taxes required by New York law because Defendants caused, or were reckless in allowing, the Company to exclude about a quarter of its fixed monthly charges to New York customers for wireless voice services from its calculation of New York sales taxes.

82.     From July 2005 through the present day, Defendants caused, or were reckless in allowing, the Company to treat that excluded portion of the monthly charges as if it were not part of a fixed periodic charge for gaining access to Sprint's wireless network for a set number of minutes of calling time, which is what it was.

83.     Instead, Defendants caused, or were reckless in allowing, the Company to inaccurately treat it as if it were a charge for per-minute usage for interstate calls and did not pay sales taxes on it in New York (and elsewhere) because per-minute usage charges for interstate calls are not subject to New York state and local sales taxes.

84.     Based on Sprint's approach, the three taxpayer defendant entities did not pay New York state and local sales taxes as follows:

        a. For flat-rate plans sold by defendant Sprint Spectrum L.P., Sprint did not
           collect or pay New York state and local sales taxes on 28.5% of its fixed

monthly charges for wireless voice services, from July 2005 until October 2008.

b. For flat-rate plans sold by defendant Nextel of New York, Inc., Sprint did not collect or pay New York state and local sales taxes on 13.7% of its fixed monthly charges for wireless voice services, from about April 2006 through October 2008.

c. For flat-rate plans sold by defendant Nextel Partners of Upstate New York, Inc., Sprint did not collect or pay New York state and local sales taxes on an amount that Sprint cannot confirm, but has represented as being 15% of its fixed monthly charges for wireless voice services, from about May 2006 through October 2008.

d. For flat-rate plans sold by all three of these companies, from October 2008 to the present, Sprint has not collected or paid New York state and local sales taxes on 22.5% of its fixed monthly charges for wireless voice services.

85.     As a result of Sprint's treatment of its fixed monthly charges for voice services, Defendants caused, or were reckless in allowing, the Company to deprive New York state and local governments of more than $100 million of tax revenue.

86.     Under the New York Tax Law, such underpayments are also subject to interest, currently at an annual rate of 14.5%, and penalties of double the amount of fraudulent underpayments or up to 30% of other underpayments.

87.     The amounts of Sprint's under-collection and underpayment of taxes continues to grow.  Defendants continue to cause, or are reckless in allowing, the Company to not collect and pay New York state and local sales taxes on the full amount of its fixed monthly charges for voice services.

**Sprint's Code of Ethics, Business Conduct, and Board Responsibilities**

88.     Sprint promulgated a Code of Conduct (the "Code") that describes the ethical and legal responsibilities that "[are] applicable to employees of Sprint and its controlled subsidiaries, the Sprint Board of Directors (Board Members), and anyone we authorize to act on Sprint's behalf."  This Code includes the following statements:

Act with Integrity

We are responsible for:

• Complying both with the letter and the spirit of all applicable laws, rules and regulations.

• Observing high ethical standards when conducting business on Sprint's behalf.

• Asking questions when in doubt about the appropriateness of a situation.

• Reporting known or suspected violations of any applicable laws, rules, regulations, policies and procedures.

• Certifying familiarity and compliance with the Code, its standards, policies and procedures.

* * *

Reporting of Financial and Non-financial Information

We have an obligation to make and keep books, records and accounts that accurately and fairly reflect our transactions and to prepare financial reports and financial statements that are not false or misleading, and that materially present full, fair, accurate, timely and understandable disclosure. Employees responsible for any aspect of our internal controls over financial reporting systems must be vigilant in recording entries accurately and honestly and in a manner consistent with all applicable legal and accounting requirements.

Misrepresentation or omission of relevant financial or non-financial information, and improper or questionable accounting and auditing practices may result in fraudulent, incomplete, inaccurate or untimely reporting. Employees should not undermine the integrity of reporting information for any reason. If you have any uncertainty about judgments concerning proper recording of our transactions or accounting or tax matters, discuss them with your supervisor.

In addition, it is strictly prohibited to influence, coerce, manipulate or mislead any internal or external party engaged in the performance of an audit for the purpose of rendering misleading financial statements or internal control assessments.

89.    According to the Company's most recent Definitive Proxy Statement filed on

Form DEF 14A with the SEC on April 5, 2012:

[The] board takes an active role in overseeing management of the Company's risks, both through its own consideration of risks associated with our operations and strategic initiatives and through its committees'

consideration of various risks applicable to such committees' areas of focus, which committees are comprised solely of independent directors. The Audit Committee reviews enterprise risks as part of its purpose to assist [the] board in fulfilling our board's oversight responsibilities with respect to the Company's enterprise risk management program. The Audit Committee receives regular reports regarding enterprise risk management matters from members of management who oversee the Company's Corporate Audit Services, or internal audit, and Legal Department and informs [the] board of such matters through regular committee reports. In addition to receiving regular reports from the Audit Committee concerning [the] enterprise risk management program, [the] board also reviews information concerning other risks through regular reports of its other committees, including information regarding financial risk management from the Finance Committee, compensation-related risk from the Compensation Committee and governance-related risk from the Nominating Committee.

[Sprint] management is responsible for day-to-day risk management. [Sprint] management and internal audit areas serve as the primary monitoring and testing function for company-wide policies and procedures, and manage the day-to-day oversight of the risk management strategy for our ongoing business. This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, compliance, and reporting levels.

The Company's previous proxy statements have similar explanations of the Board's oversight responsibility.

90.    According to Sprint's proxy statements, the Board met officially twelve times in 2005 (five regular meetings and seven special meetings), fourteen times in 2006 (seven regular meetings and seven special meetings), twenty times in 2007 (six regular meetings and 14 special meetings), seventeen times in 2008, nine times in 2009, seven times in 2010, and fifteen times in 2011.

91.    As a matter of corporate governance in connection with Board meetings, senior officers of Sprint and/or members of the Company's committees prepared packages of relevant information concerning the business and financial position of the Company, including internal audit reports that detailed the functions of critical departments of the Company, litigation reports detailing pending or possible litigation or regulatory actions concerning the Company.

Defendants, under existing principles of corporate law and governance, had the responsibility to ensure that Sprint had in place a reporting system that would enable them to determine if Sprint's activities complied with applicable law and whether proper reports were being generated.

92.     Sprint currently has, and for substantially the duration of the relevant period had, five committees: the Audit Committee, the Finance Committee, the Compensation Committee, the Executive Committee, and the Nominating and Corporate Governance Committee.

93.     As listed in the most recent Definitive Proxy Statement filed on Form DEF 14A with the SEC on April 5, 2012, the primary functions of the Audit Committee are to:

> Assist [the] board in fulfilling its oversight responsibilities with respect to:
> - the integrity of [Sprint's] financial statements and related disclosures, as well as related accounting and financial reporting processes;
> - [Sprint's] compliance with legal and regulatory requirements;
> - [Sprint's] independent registered public accounting firm's qualifications, independence, audit and review scope, and performance;
> - the audit scope and performance of [Sprint's] internal audit function;
> - [Sprint's] ethics and compliance program; and
> - [Sprint's] enterprise risk management program.
>
> The Audit Committee also has sole authority for the appointment, retention, termination, compensation, evaluation and oversight of [Sprint's] independent registered public accounting firm.

94.     The primary functions of the Nominating and Corporate Governance Committee include:

> - ensuring that our company has effective corporate governance policies and procedures and an effective board and board review process

95.     Moreover, Individual Defendants (for the years in which they were directors) signed Sprint's Forms 10-K filed with the SEC each year during the relevant period and, in so doing, were required to assure themselves, through their due diligence of the matters discussed

therein and of Sprint's business, operations, and finances, that the Forms 10-K filed with the SEC were accurate. Through this process the Individual Defendants were required to make themselves aware of Sprint's regulatory status and exposure, including the appropriate payment of taxes. For example, the Company's most recent 10-K states the following:

> If our interpretation of certain laws or regulations, including those related to various state matters such as sales, use or property taxes, were found to be mistaken, it could result in payments by us.

And further contains the following discussion of income tax:

> The consolidated effective tax rate was an expense of approximately 10% and 5% in 2011 and 2010, respectively, and a benefit of approximately 30% in 2009. The income tax expense for 2011 and 2010 and the benefit for 2009 include a $1.2 billion, $1.4 billion, and $281 million net increase to the valuation allowance for federal and state deferred tax assets primarily related to net operating loss carryforwards generated during the respective periods. The 2011 increase to the valuation allowance was also inclusive of $21 million associated with federal income tax effects of recently enacted changes in corporate state income tax laws, and resulted in a total charge to income tax expense of $59 million.

This Form l0-K was signed by all the Individual Defendants with the exception of Nuti.

96.     Additional Forms 10-K filed during the relevant period contain paragraphs similar to those above, and were signed by the Individual Defendants who served at the time:

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

98.     Plaintiff brings this action derivatively in the right of and for the benefit of Sprint to redress injuries suffered and to be suffered by Sprint as a direct result of the violations of law, breaches of fiduciary duty, corporate mismanagement, abuse of control, as well as the aiding and abetting thereof, by the officers and/or directors of Sprint.

99.     Sprint is named as a nominal defendant solely in a derivative capacity.

100.    Plaintiff will adequately and fairly represent the interests of Sprint in enforcing and prosecuting their rights.

**Sprint Knew It Was Violating Its New York Sales Tax Obligations**

101.    As detailed in the *qui tam* complaint, at the time Defendants caused, or were reckless in allowing, the Company to decide to unbundle its flat-rate plans and to treat a part of its fixed monthly charges for wireless voice services as non-taxable in New York, and at all times since, Defendants were fully aware of the New York Tax Law provisions concerning the Company's obligation to pay sales taxes with respect to fixed monthly charges for wireless voice services.

102.    In 2002, when amendments to the New York Tax Law were under consideration with respect to telecommunications sales taxes, Sprint was part of an industry group that actively lobbied for the law to match its interests. As part of these lobbying efforts, an internal lobbyist at Sprint, together with other industry representatives, met with representatives of the New York Tax Department shortly before the May 29, 2002 enactment of the amendments, in an effort to influence the legislation.

103.    In connection with these lobbying efforts, Sprint reviewed the pending legislation.

104.    Sprint's lobbyists were also in communication with the New York Tax Department concerning the guidance the Department issued just before the sales tax law amendments became effective. An outside lobbyist for Sprint obtained a copy of the draft of the 2002 TSB-M from the New York Tax Department and then forwarded it to Sprint's internal lobbyist, who then forwarded it to the leaders of Sprint's internal State and Local Tax Group. According to the internal lobbyist, Sprint was being given an opportunity to comment on the

TSB-M. Sprint reviewed the draft of the 2002 TSB-M.  The draft was in all material respects the same as the final version of the 2002 TSB-M issued on July 30, 2002.

105.    Also in 2002, the head of Sprint's State and Local Tax Group warned other companies at a Communications Tax Executive Conference at Vail, Colorado that unbundling posed risks of audits by taxing authorities and litigation, and that they should protect themselves from these risks by entering into agreements with taxing authorities or by seeking clarifying legislation before they began to unbundle. Sprint itself did not seek out any such agreements with taxing authorities in New York, nor did it seek additional legislation in New York.

106.    In 2003, Sprint's Senior State and Local Tax Counsel presented to another industry group – the Wireless Tax Group – about "Sprint's Bundling Experience." He told other wireless carriers that "unbundling for taxes causes significant assessment risk." He told the group that his "marching orders" at Sprint were to "mitigate tax issues by pursuing legislation or pre-audit agreements that allow for component taxing."

107.    Defendants caused, or were reckless in allowing, the Company to not follow those "marching orders" in New York.

108.    By July 2005, when Defendants caused, or were reckless in allowing, the Company to begin to implement its decision not to pay New York sales taxes on the full amount of its fixed monthly charges to New York customers for wireless voice services, Sprint had reviewed New York sales tax law, including New York Tax Law Sections 1105(b) and 1111(l). Similarly, it made the decision only after reviewing the guidance from the New York Tax Department in the 2002 TSB-M.

109.    Sprint's Senior State and Local Tax Counsel, who was charged with understanding state and local tax law, when asked "how many times would you say you have read [the relevant New York tax law]," including Section 1105(b), testified "a hundred or more."

110.    Defendants caused, or were reckless in allowing, the Company to not seek any guidance from the New York Tax Department about the application of the 2002 amendments or other New York law concerning sales taxes on the fixed monthly charges for wireless voice services or other bundled mobile telecommunications products.  Defendants chose not to despite the fact that the New York Tax Department routinely provides such guidance to taxpayers and that Sprint has, in the past, consulted with the New York Tax Department on other tax matters.

111.    While it considered how to unbundle its flat-rate plans, Defendants did not seek or obtain any advice from outside attorneys or others outside the company with respect to its New York sales tax obligations concerning its fixed monthly charges for wireless voice services.

112.    Defendants continue to cause, or are reckless in allowing, the Company to continue to not collect and pay New York state and local sales taxes on the full amount of its receipts from its fixed monthly charges for wireless voice services, despite being specifically informed of the illegality of this practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department.

113.    Defendants have caused, or were reckless in allowing, the Company to repeatedly make false records and statements material to its obligations to collect and pay New York sales taxes on the full amount of the fixed monthly charges it received from New York customers for wireless voice services.

114.    Each and every one of the submitted tax forms, for all periods since Defendants caused, or were reckless in allowing, the Company to begin its unbundling program has been

27

false in that not one states the accurate amount of sales taxes due. Instead, these statements understate the taxes due because Defendants caused, or were reckless in allowing, the Company to illegally and fraudulently fail to apply sales taxes to the part of its fixed monthly charges that it internally chose to classify as non-taxable "usage airtime: interstate" in its data systems.

115.    At the time Defendants caused, or were reckless in allowing, the Company to submit each of these tax forms and make these false statements as to each of the various taxing jurisdictions, Defendants had actual knowledge of what was required by New York sales tax law, that Sprint was not paying state and local sales taxes on its full fixed monthly charges for wireless voice services, and that such breaking out of the fixed monthly charges was not permitted under New York tax law. Defendants thus knew that the Company's repeated statements of the sales taxes it owed were false because they severely understated the tax due.

116.    At a minimum, Defendants caused, or were reckless in allowing, Sprint to act in deliberate ignorance of the truth or falsity of the information it included in its sales tax filings or it recklessly disregarded the truth or falsity of the information.

117.    Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within New York was material to the obligation of Sprint to pay the correct amount of sales taxes for the tax period represented by each filing.

118.    Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within New York was also material to Sprint's obligation to pay its total past underpayment of the sales taxes. Each filing continued to conceal (a) the existence of the underpayment in past periods, and (b) Sprint's ongoing and continuing conduct of submitting false tax filings. Each filing was a false record and statement that ensured that the taxing

authorities of the state and local governments would not know of the underpayment and therefore would not seek to collect the moneys owed.

119.    When Defendants caused, or were reckless in allowing, the Company to make each of its New York sales tax filings and the separate representations in them for each taxing jurisdiction, they made it less likely that the state or local governments would know about, or collect, or attempt to collect or receive any payment of Sprint's obligation to pay the total underpayment that had accumulated at that time.

**Demand is Excused**

120.    Plaintiff has not made any demand on Sprint's Board of Directors to institute this action since such demand would be a futile and useless act for the following reasons:

a.    The egregious acts complained of herein are violations of law and breaches of the fiduciary duties owed by the Individual Defendants and could never be the product of sound business judgment and constitute bad faith and indicate a substantial likelihood of director liability;

b.    The improper and illegal actions alleged herein were engaged in knowingly and attempts were made to conceal the actions from outside detection;

c.    The Company has been confronted with the wrongdoing alleged herein and yet the Board has refused to act in discontinuing the illegal tax evasion and has refused to remedy the unpaid taxes;

d.    The duration of the wrongdoing, as alleged herein, and the magnitude of the proposed $300 million liability, further reflects a lack of good faith on the part of the Defendants;

e.      The entire current Sprint Board of Directors participated in or approved many of the acts and omissions or were on notice of and/or recklessly disregarded the wrongs complained of herein;

f.      The Individual Defendants cannot be relied upon to reach a truly independent decision as to whether to commence the demanded actions against themselves and the officers, employees or consultants responsible for the misconduct alleged in this Complaint, in that, *inter alia*, the Individual Defendants are the same persons who culpably allowed the wrongful conduct to occur on their watch, and therefore they are impaired from validly exercising their business judgment and are rendered   incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.      In order to bring this action for breaching their fiduciary duties, the Individual Defendants would be required to sue themselves and/or their fellow directors and allies in the top ranks of the Corporation, which they could not be expected to do. Therefore, the Individual Defendants would not be able to vigorously prosecute any such action; and

h.      If Sprint's current and past officers and directors are protected against personal liability for their acts of mismanagement, deception and breaches of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance, they caused the Corporation to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Sprint.  However, the directors' and officers' liability insurance policies covering the defendants in this case may contain provisions that eliminate coverage for any action brought directly by Sprint against these

defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Sprint, there would be no directors' and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, the "insured versus insured exclusion" will not apply and will provide a basis for the Corporation to effectuate a recovery.  If there is no directors' and officers' liability insurance at all then the defendant directors will not cause Sprint to sue them, since they will face a large uninsured liability.

## COUNT I

### Breaches of Fiduciary Duties Against Individual Defendants

121.    Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

122.    The Individual Defendants are fiduciaries of Sprint and owe to it the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based upon Sprint and its employees' acts in violation of state law, which acts were not stopped by the Individual Defendants and which constitute breaches of fiduciary duties.

123.    The Individual Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts known to them or of which they should have obtained knowledge, and failed to exercise due care to prevent the inappropriate surveillance activity.  The Individual Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, that contrary to public statements, Sprint was willfully evading the collection and payment of state and local taxes.  The Individual Defendants thereby

31

breached their duty of care, loyalty, accountability and disclosure to the Company by failing to act as an ordinary prudent person would have acted in a like position.

124.    The Individual Defendants have been responsible for the gross and reckless mismanagement of Sprint.  They abdicated their corporate responsibilities by mismanaging the Company in at least the following ways:

a.    They allowed and participated in a scheme to evading the collection and payment of state and local taxes;

b.    They concealed from the Company's shareholders and the investing public the fact that Sprint was evading the collection and payment of state and local taxes;

c.    They subjected Sprint to adverse publicity and potential liability that has already impaired its earnings and may possibly lead to civil penalties in excess of $300 million.

125.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties to the Company to prudently manage the assets and business of Sprint in a manner consistent with the operations of a publicly held corporation.

126.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sprint has been exposed to the possibility of significant damages in excess of hundreds of millions of dollars.

127.    The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

128.    By reason of the foregoing, the Individual Defendants have breached their fiduciary obligations to Sprint.

129.    Sprint has been injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a shareholder representative of Sprint, seeks damages and other relief for the Company as hereinafter set forth.

## COUNT II

### Against Individual Defendants for Unjust Enrichment

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    By their wrongful acts and omissions, Individual Defendants were unjustly enriched at the expense of and to the detriment of Sprint.

132.    Plaintiff, as a shareholder representative of Sprint, seeks restitution from Defendants, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

133.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

134.    Plaintiff on behalf of Sprint has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of Sprint as follows:

(1)    Determining that this action is a proper derivative action maintainable under law and demand is excused;

(2)    Declaring that Defendants have violated their fiduciary duties to the Company;

(3)     Awarding against each and all of the Defendants and in favor of the Company the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

(4)     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Individual Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Sprint has an effective remedy;

(5)     Removing each of the Individual Defendants from the Board of Directors;

(6)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(7)     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by a jury on all claims asserted herein to take place at Kansas City, Kansas.

DATED: April 25, 2012                    **LOGAN LOGAN & WATSON, L.C.**

By:     ___/s/ M. Bradley Watson___
                M. Bradley Watson

M. Bradley Watson, Bar No. 12149
8340 Mission Road
Suite 106
Prairie Village, KS 66206
Telephone: (913) 381-1121
Facsimile: (923) 381-6546
Email: bwatson@loganlaw.com

Peter Safirstein
Domenico G. Minerva
Elizabeth S. Metcalf
**Morgan & Morgan, P.C.**
Five Pennsylvania Plaza
New York, NY  10001
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email: psafirstein@forthepeople.com
Email: dminerva@forthepeople.com
Email: emetcalf@forthepeople.com


Christopher S. Polaszek
**Morgan & Morgan, P.A.**
One Tampa City Center
201 N. Franklin St., 7th Fl.
Tampa, FL 33602
Telephone: (813) 314-6484
Facsimile: (813) 222-2406
Email: cpolaszek@forthepeople.com


Richard K. Witchko, Esq.
3751 Gibsonia Road
Gibsonia, PA 15044
Telephone: (724) 444-4311
Facsimile: (724) 444-4312
Email: rwitchko@earthlink.net

*Counsel for Plaintiff*