**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
-----------------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK, by ERIC
T. SCHNEIDERMAN, Attorney General for the State
of New York, and

STATE OF NEW YORK, *ex rel.* EMPIRE STATE                    INDEX NO. 103917-2011
VENTURES, LLC,

                               Plaintiff,                    **SUPERSEDING COMPLAINT**

        v.

SPRINT NEXTEL CORP., SPRINT SPECTRUM L.P.,
NEXTEL OF NEW YORK, INC., NEXTEL
PARTNERS OF UPSTATE NEW YORK, INC.,

                               Defendants.

-----------------------------------------------------------------X

      The State of New York, through the Attorney General of the State of New York, having

superseded the complaint of the *qui tam* plaintiff herein, brings this action against defendants

Sprint Nextel Corp., Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of

Upstate New York, Inc. (collectively, "Sprint"), pursuant to the New York False Claims Act,

Executive Law, and the Tax Law.

### NATURE OF THIS ACTION

      1.     This action arises out of Sprint's knowing and fraudulent failure to collect and

pay more than $100 million in New York sales taxes on receipts from its sale of wireless

telephone services since July 2005.  Specifically, Sprint illegally avoided its New York sales tax

obligations on about 25% of its receipts for "flat-rate" calling plans – plans for which customers

pay a fixed monthly charge for a set or unlimited amount of calling time.

2.      Sprint's decision to not collect and pay the required sales taxes in New York arose out of a nationwide scheme to gain an advantage over its competitor wireless carriers, not by cutting its prices or offering better service, but by failing to collect and pay sales taxes, thereby reducing the cost of its products to its customers.  The consequence of this scheme was that Sprint knowingly deprived state and local governments of the tax revenues that provide necessary services to citizens.

3.      Sprint concealed this scheme from taxing authorities, its competitors, and its customers.

4.      New York unequivocally imposes sales taxes on the entire amount of fixed monthly charges for wireless voice services.  For example, one of Sprint's wireless calling plans provides for up to 450 minutes of talking time for $39.99 per month.  Under New York sales tax law, the fixed monthly charge of $39.99, in full, is subject to sales taxes.

5.      Sprint had actual knowledge that it was required to collect and pay New York sales taxes on the full amount of these fixed monthly charges, yet it chose to act contrary to the law to advance its own competitive interests.  Starting in July 2005 and continuing today, Sprint knowingly and deliberately failed to collect and pay the taxes on about one quarter of its revenue from these fixed monthly charges, and Sprint has repeatedly and knowingly submitted false records and statements to New York State concealing this failure.  It falsely asserted on its sales tax filings that it owed less in sales taxes than it really did.  Each of these statements and records was material to Sprint's sales tax obligations.  Sprint owed substantially more than it reported.

6.      Even after New York tax authorities instructed Sprint that its tax avoidance scheme was illegal, Sprint not only failed to pay the back taxes it owed, but it has continued to underpay sales taxes and submit false tax returns.

2

7.      Unlike Sprint, Sprint's primary wireless competitors, including Verizon, AT&T, T-Mobile, and MetroPCS, have followed the law regarding these taxes.  Each collects and pays sales taxes in New York on the full amount of their revenues from flat-rate charges for wireless voice services.

8.      Sprint has also misled millions of New York customers who purchased Sprint flat-rate plans.  In its customer contracts, on its website and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes.  Yet Sprint did not, and it concealed this fact from its New York customers.  As a result, Sprint exposed these customers to the risk of having to pay the unpaid taxes, for they are also liable under the law if Sprint fails to pay.  Although Sprint misrepresented how it would handle sales taxes, it has locked its customers into contracts with early termination fees.  The customers must remain in these contracts sold under false pretenses unless they pay hundreds of dollars to Sprint.

9.      In this action, New York, through the Attorney General, seeks to (a) recover damages from Sprint for the tax revenue lost to the State of New York and its local governments, trebled, as a result of Sprint's violation of the New York False Claims Act; (b) require Sprint to collect and pay sales taxes on the full amount of its fixed monthly charges for voice services going forward; (c) enjoin Sprint from charging early termination fees currently applicable to customers that have purchased flat-rate wireless plans in New York under false pretenses; and (d) obtain penalties against Sprint as provided by law for its deliberate and illegal conduct.

## WHISTLEBLOWER ACTION

10.     This action was filed on or about March 31, 2011 by whistleblower, or *qui tam* plaintiff, Empire State Ventures, LLC under the New York False Claims Act.  The New York False Claims Act permits whistleblowers who know of information concerning false or fraudulent conduct that victimizes the government through the failure to pay taxes and otherwise to bring an action on behalf of the government.  The government then has an opportunity to investigate the matter and decide whether to take over the action.

11.     In this case, the Office of the Attorney General has conducted an investigation of Sprint's New York state and local sales tax practices with respect to its fixed monthly charges for wireless calling plans.  On April 19, 2012, the Attorney General notified the Court of its decision to supersede the *qui tam* plaintiff's complaint.  The People of the State of New York have thus been substituted as the plaintiff, and the action has been converted in all respects from a *qui tam* civil action brought by a private person into a civil enforcement action by the Attorney General.

## JURISDICTION & PARTIES

12.     The State of New York, through the Attorney General, brings this action in its sovereign capacity, and pursuant to State Finance Law § 190(b), Executive Law § 63(12), and Tax Law § 1141(a).  It sues to redress injury to the State and to its local governments, general economy and citizens, and seeks injunctive relief, damages, costs, penalties and other relief with respect to Sprint's fraudulent and otherwise unlawful conduct.

13.     This Court has personal jurisdiction over the defendants because the defendants can be found, reside and/or transact business in New York State and New York County.

14.     Venue is proper in this Court pursuant to CPLR § 503.

15.     Defendant Sprint Nextel Corporation is a mobile telecommunications service provider that does business in the State of New York and nationally and internationally.  Sprint currently has about 55 million customers, including about 1.82 million wireless customers in New York State, and annual revenues of approximately $33 billion.  Sprint Nextel Corporation is incorporated in the State of Kansas, with a principal executive office located at 6200 Sprint Parkway, Overland Park, Kansas 66251.  Sprint Nextel Corporation is registered to be traded on the New York Stock Exchange.

16.     Defendant Sprint Spectrum, L.P. is a mobile telecommunications service provider that does business in the State of New York.  Sprint Spectrum, L.P. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

17.     Defendant Nextel of New York, Inc. is a mobile telecommunications service provider that does business in the State of New York.  Nextel of New York, Inc. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

18.     Defendant Nextel Partners of Upstate New York, Inc. is a mobile telecommunications service provider that does business in the State of New York.  Nextel Partners of Upstate New York, Inc. is incorporated in the State of Delaware and is a wholly-owned indirect subsidiary of Sprint Nextel Corporation.

## FACTUAL ALLEGATIONS

I.     **Sprint's Flat-Rate Wireless Calling Plans**

19.     In New York, Sprint sells wireless calling plans through its subsidiary entities Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York, Inc. These plans are all branded as "Sprint" plans and are centrally developed and overseen by Sprint Nextel Corporation.

20.     Throughout the period from July 2005 to the present, Sprint has offered for sale to New York customers wireless calling plans that include voice services in exchange for fixed monthly charges.  The voice services provided under these plans consist of the ability of Sprint's customers to use Sprint's wireless network to make phone calls for a set number of minutes, or for an unlimited number of minutes.

21.     The fixed monthly charge for these voice services is billed to customers regardless of whether the customers actually use the network during the month, regardless of how much they use the available minutes, and regardless of whether calls are made to people or phones within the same state – int*ra*state calls – or people or phones in other states – int*er*state calls.  Under these plans, calls within the monthly number of minutes are not billed on a per-minute basis.

22.     In short, the fixed monthly charges that Sprint's customers pay for wireless voice services under Sprint's flat-rate plans are for *access*, not for specific calls; hence Sprint identifies these charges on customer invoices as "monthly recurring *access* charges" (emphasis added).

23.     Sprint charges its customers differently for calls that are *not* within the fixed monthly charge.  When customers use more than the allowed minutes in a month for phone calls, they are charged for that separate usage – or "overage" – on a per-minute basis.

24.     By way of illustration, Sprint currently offers a calling plan under which a customer is charged $39.99 a month for the ability to use – or access – Sprint's network for up to 450 minutes of calling time per month.  Overage minutes cost 45 cents each.  The $39.99 will be charged if the customer makes no calls at all, uses one minute of calling time or uses 449 minutes of calling time.  If the customer uses 451 minutes of calling time, he or she will have to pay the $39.99 fixed monthly charge plus a $0.45 usage charge for the overage.

25.     Sprint's customers typically purchase flat-rate calling plans by signing a contract with Sprint.  These contracts are provided by Sprint and are not subject to negotiation by the customer.  They usually have a term of one or two years.  A customer who chooses to cancel a contract before the term ends is subject to an early termination fee payable to Sprint.  Usually, these early termination fees are in excess of $200.

26.     Sprint represents in its contracts and on its website that it will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government.

27.     Since before July 2005, Sprint has sent its New York customers monthly invoices for services provided under its flat-rate plans.  These invoices state the fixed monthly charge for the plan, and they separately state the charges for any overage minutes.  They also set forth a charge for sales taxes, but they do not indicate how the sales taxes are calculated.

28.     The invoices do not indicate that Sprint has calculated sales taxes on less than the full fixed monthly charge for voice services.

29.     The invoices do not indicate to customers that Sprint is charging less sales taxes than required by law, and that customers can be held liable for any resulting underpayment.

## II.     Sprint's Obligation to Pay New York Sales Taxes on Its Flat-Rate Calling Plans

30.     Since at least August of 2002, New York State and localities within New York State require and have required the payment of sales taxes on the *full amount* of fixed monthly charges for wireless voice services sold to customers in New York.  Sprint, as the provider of the services, is required to collect the sales taxes from its customers and pay them to the State.

31.     For example, when Sprint receives payment of a fixed monthly charge of $39.99 for 450 minutes of wireless voice services, Sprint is required to collect and pay sales taxes on the entire $39.99.

32.     New York Tax Law contains a specific provision concerning how sales taxes are to be applied to fixed monthly charges for wireless voice services.  According to N.Y. Tax Law Section 1105(b)(2), sales taxes are to be applied to:

> the receipts from every sale of mobile telecommunications services provided by a home service provider, other than sales for resale, that are voice services, or any other services that are taxable under subparagraph (B) of paragraph one of this subdivision, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.

This provision has been in effect continuously since August 2, 2002.

33.     The Tax Law, and this section in particular, clearly requires the payment of sales taxes on the *full amount* of fixed periodic charges for wireless voice services sold by companies like Sprint to New York customers, as follows:

a.   Sprint is a "home service provider" because it is a facilities-based carrier with which mobile telecommunications customers contract for the provision of mobile telecommunications service.

b.   The mobile telecommunications services sold by Sprint under the flat-rate plans are not sold for resale.

c.   Under Sprint's flat-rate plans, Sprint sells wireless voice services for a fixed periodic charge.

d.   Sprint does not separately state or otherwise break out any portions of the fixed periodic charge for voice services in invoices or other communications with customers.

e. Sprint's fixed monthly charges for wireless voice services are not for "other services that are taxable under subparagraph (B) of paragraph one of [Section 1105(b)]."

34.     On July 30, 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M"). There, it explained that for mobile telecommunications, "the *total charge* for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2)" (emphasis added).

35.     The 2002 TSB-M gave a concrete example demonstrating that the amended law requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how – or whether – a customer uses them:

> *Example 1*:  Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a flat-rate charge of $49.95 per month.  The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan.  In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month.  *Such charge is subject to sales tax under section 1105(b)(2) of the Tax Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls*.  (2002 TSB-M at 3) (emphasis added).

36.     The various counties within the State of New York, along with New York City and certain school districts and other local entities, impose sales taxes on the identical services. The sales tax rate imposed on such services varies by locality, and the taxes in each must be paid in addition to the New York State sales taxes.

37.     Under New York sales tax law, the obligations are different with respect to certain telecommunications services that are *not* sold for a fixed periodic charge.  For overage minutes that are charged to customers on a per-minute usage basis, Sprint and other wireless carriers are

required to collect and pay New York state and local sales taxes only when such calls are

int*ra*state, and are not required to collect and pay them on such calls that are int*er*state.

38.     The New York Tax Department's 2002 TSB-M guidance further illustrated this

situation in its next example:

> *Example 2:* The facts are the same as in *Example 1*, except that Mr. Smith
> exceeds the calling minutes allowed under the plan. *The $49.95 flat-rate
> charge is subject to tax under section 1105(b)(2) of the Tax Law*, and the
> separate charges for intrastate calls included in the excess minutes are
> subject to sales tax under section 1105(b)(1)(B) of the Tax Law. The
> separate charges for interstate or international calls included in the excess
> minutes are not subject to sales tax.  (2002 TSB-M at 3-4) (emphasis
> added).

39.     New York tax law also spells out how wireless carriers can apply sales taxes

when selling "bundles" of services for a fixed periodic charge where some of the services

included in the bundle would be taxable if they were sold separately from the bundle (such as

voice services sold for a fixed periodic charge), while other services would *not* be taxable if they

were sold separately from the bundle (such as Internet services).

40.     As a general matter, if any one component service included in a bundle is subject

to sales taxes when sold on its own, then the charge for the entire bundle is subject to sales taxes.

New York tax law, however, allows a wireless carrier, in defined situations, to break out from

the bundle, or "unbundle," the charge so it does not have to collect and pay sales tax on a charge

for a service that would not be subject to sales tax if it were sold separately and not as a

component of a bundle of services.  This unbundling is also referred to as "component taxation."

41.     For example, Sprint's $39.99 flat-rate plan for access to Sprint's wireless network

for 450 minutes of calling time is sold in another variation:  for an additional $30, the customer

can include unlimited Internet access in the plan.  The plan thus consists of two components:

wireless voice services and Internet access.  Because a charge for Internet access is not, on its

own, subject to New York state and local sales taxes, Sprint is permitted (if it follows all the rules set forth in New York law) to unbundle the Internet portion of the overall charge and not collect and pay sales taxes on that Internet portion.

42.     New York's unbundling rules are set forth in section 1111(*l*) of the New York Tax Law.  Under that section, wireless providers are permitted to treat separately for sales tax purposes certain components of a bundled charge for mobile telecommunication services, so long as the charges are *not* for voice services, and so long as service provider uses an "objective, reasonable and verifiable standard for identifying each of the components" of a bundled charge. The New York Tax Department's 2002 TSB-M guidance also illustrated this situation with examples:

> *Example 7*: Mrs. Johnson's place of primary use is an address in Buffalo, NY. She receives both cellular telephone service and Internet access service from her home service provider. The home service provider separately states the charge on Mrs. Johnson's bill for the cellular service and for the Internet access service. *The charge for the cellular service is subject to sales tax*, while the charge for Internet access service (so long as reasonable) is not, because it is separately stated.

> *Example 8*: The facts are the same as in *Example 7*, but the charges for the cellular service and the Internet access service are not separately stated. In this instance, the total charge is considered a receipt from the charge for mobile telecommunications service and is subject to sales tax, under section 1105(b)(2).

> *Example 9*: The facts are the same as in *Example 8*, except the home service provider properly identifies, accounts for, and quantifies the receipts from each of the components of the total charge attributable to the cellular service and the Internet access service based on objective, reasonable and verifiable standards. *In this instance, the home service provider is only required to collect and pay over sales tax that is attributable to the receipts associated with the cellular service*. The portion of the receipt attributable to the Internet access service is excluded from taxation.  (2002 TSB-M at 3-4) (emphasis added).

43.     Unbundling cannot be used to avoid sales tax on a component service that the state or local government has chosen to tax; it can only be used to separate non-taxable services from taxable ones. A wireless carrier cannot, under the guise of unbundling, avoid sales tax on a taxable service.  Because New York law treats fixed monthly charges for wireless voice services as a single, irreducible, taxable service that cannot be broken out for sales tax purposes, Sprint violated the law by failing to collect and pay New York state and local sales taxes on the full amount of the charges.

III.    **Sprint's Decision to "Unbundle" Its Plans Nationwide**

44.     Beginning in July 2005, Sprint began to implement a nationwide program of unbundling its wireless offerings for sales tax purposes.  As part of this program, it began treating part of its fixed monthly access charges for wireless voice services as if they were charges for "interstate" calls charged on a per-minute basis, and, in states like New York, not collecting and paying sales taxes on that part.  The fixed monthly charges for access to Sprint's network, however, were and are not taxable in the same way as per-minute usage charges.

45.     Internally, Sprint acknowledged that its approach to unbundling in this way was aggressive and risky because tax authorities throughout the country could object to the practice. However, it served Sprint's interest of gaining a competitive advantage by having uniquely low sales tax collections, and thus low overall billing for its plans.

46.     Under New York law, Sprint's approach was and is unequivocally illegal.

A.      **Sprint's Decision to Unbundle Its Plans Nationwide to Gain a Competitive Advantage**

47.     From the outset, Sprint's decision to unbundle its calling plans nationwide was driven by its desire to gain an advantage over its competitors by reducing the amount of sales

taxes it collected from its customers and, thereby, appearing to be a low-cost carrier while reducing revenues for state and local governments and not reducing its own revenues.

48.     Before 2002, Sprint began to consider unbundling its flat-rate plans that included wireless voice services.  Responsibility for implementing the plan fell to Sprint's business unit called the State and Local Tax Group.  This group was and is headed by a Sprint Assistant Vice President who reports to Sprint's Vice President of Tax, who, in turn, reports to Sprint's Chief Financial Officer.  In 2005, the group had 108 permanent employees.  It also had resources that gave it ready access to tax laws, guidance and other materials to aid in the analysis and understanding of Sprint's state and local sales tax obligations, including its obligations under the New York Tax Law.

49.     Initially, Sprint did not recognize the financial benefit of component taxation. One Sprint employee reported that Sprint had earlier considered unbundling Internet access from combined Internet/voice plans, but "the project was scrapped because there wasn't enough bang for the buck."

50.     By 2002, Sprint came to realize, however, that if it collected less in sales taxes than its competitors by deeming part of its fixed monthly charges to be non-taxable, it could effectively lower the cost of its service as compared with its competitors, without hurting its own bottom line, and thereby obtain a competitive advantage.

51.     On or about May 15, 2002, a member of Sprint's State and Local Tax Group prepared Sprint's "business case" for component taxation.  The business case stated that unbundling would "provide a competitive advantage over wireless carriers who aren't able to perform component taxing."

52.     To further its plan, Sprint encouraged its competitors to take a conservative path and be open and transparent with regulators with regard to component taxation, while Sprint quietly took another path.  Also in 2002, the head of Sprint's State and Local Tax Group warned other companies at a Communications Tax Executive Conference at Vail, Colorado that unbundling posed risks of audits by taxing authorities and litigation, and that they should protect themselves from these risks by entering into agreements with taxing authorities or by seeking clarifying legislation before they began to unbundle.  Sprint itself did not seek out any such agreements with taxing authorities in New York, nor did it seek additional legislation in New York.

53.     In 2003, Sprint's Senior State and Local Tax Counsel presented to another industry group – the Wireless Tax Group – about "Sprint's Bundling Experience."  He told other wireless carriers that "unbundling for taxes causes significant assessment risk."  He told the group that his "marching orders" at Sprint were to "mitigate tax issues by pursuing legislation or pre-audit agreements that allow for component taxing."

54.     Sprint did not follow those "marching orders" in New York.

55.     Around the time Sprint was advising competitors how they should approach component taxation, Sprint conducted competitive surveillance, and learned that other major wireless carriers were working to unbundle by breaking out charges for Internet access from charges for wireless voice services, but were not seeking to break out their charges for wireless voice services into smaller portions for sales tax purposes.

56.     By September 2004, Sprint was refining its consideration of how to approach unbundling and component taxation.  One approach, which Sprint identified as "conservative,"

involved unbundling only Internet access from voice services.  This was the approach to component taxation that Sprint understood some its competitors were pursuing.

57.     Another approach, which Sprint viewed as aggressive and risky, and which would allow Sprint to be a "low cost tax leader in the wireless industry," involved unbundling "interstate usage" from within its fixed monthly charge for wireless voice services. Because the fixed monthly charge is not divisible based on customer usage, unbundling in this way required Sprint to come up with an arbitrary method of allocating the charge into sub-parts.

58.     At the time Sprint was considering these approaches to component taxation, the majority of Sprint's revenue from its wireless plans was coming from its fixed monthly charges for wireless voice services.  Treating some portion of these charges as "interstate usage" presented the greatest opportunity for Sprint to reduce its collection of taxes, and improve its competitive standing nationwide because many states, including New York, do not charge sales taxes on receipts from charges for interstate calls billed on a per-minute basis.

59.     An internal Sprint analysis from January 2005 showed that, if Sprint unbundled only its Internet access charges, it would reduce sales taxes by about $623,000 per month.  The analysis further revealed that if Sprint also broke out charges for wireless voice services into what it deemed taxable and non-taxable categories, it would reduce sales taxes by an additional $4.6 million per month.  Thus, if competitors were breaking out only Internet access charges, Sprint concluded that its plans would be about $4.6 million per month cheaper, collectively, than competitors' plans by paying less money to the government, without any cost to Sprint.

60.     In early 2005, Sprint's Assistant Vice President of State and Local Tax, its Director of External Tax, and other Sprint employees met and decided to recommend to more senior Sprint executives that the company adopt the aggressive approach to unbundling that

included breaking out its fixed monthly charge for wireless voice services and treating part of the charge as if it were for interstate usage billable on a per-minute basis.

61.     The senior executives authorized that approach.

62.     Sprint made its decision to break out its fixed monthly charges for voice services before it completed the merger with Nextel Corporation in August of 2005.  After the merger was complete, Sprint used the same approach to unbundling plans sold by Nextel, and justified this approach internally by citing to the competitive advantage it would achieve by unbundling in the same way as the pre-merger Sprint plans.  It described the "quantitative impact" of the move as "decreas[ing] churn," and described a "key benefit" as "lower churn."  "Churn" is a measure used within the telecom industry to refer to the loss of subscribers.  A low churn rate is favorable to a wireless carrier.  Sprint and other telecom carriers publicly disclose their churn rates, and analysts and investors closely monitor churn.  Sprint incentivizes its employees to lower churn by increasing employee bonuses when Sprint's churn rate declines.

63.     Other major wireless carriers, unlike Sprint, did not break their fixed monthly charges for wireless voice services into subparts for sales tax purposes.

64.     In New York alone, by under-collecting and under-paying New York state and local sales taxes, Sprint plans were made $100 million less expensive than its competitors' plans from mid-2005 to the present.

**B.     Sprint Classifies Arbitrary Percentages of Its Fixed Monthly Charges as Non-Taxable**

65.     Sprint used data systems to generate its customer invoices and to create its sales tax filings.  It could accurately collect and pay taxes only if it used the categories within the systems appropriately.  One of the systems allows Sprint to break out its charges into various taxing categories, and contains settings that will cause the system to treat charges placed in a

category as "taxable" or "non-taxable" for any given taxing jurisdiction.  The vendor for this taxing system provided Sprint with these taxable and non-taxable decisions for each tax category, and Sprint reviewed these taxability decisions.  Where Sprint disagreed with the vendor, it overrode the vendor's taxability decisions.

66.     Before starting to unbundle its wireless calling plans, Sprint used the taxing system by classifying the full amount of its fixed monthly access charges for wireless voice services as "network access."  "Network access" is defined in the system's reference manual as "a charge to have access to a cellular or paging network."  Sprint's fixed monthly charges for wireless voice services were just such charges.

67.     Once Sprint began its unbundling program, however, it did not use the taxing system for purposes of collecting and paying sales taxes in the way it was designed.  While the system was set up to treat the full amount of a fixed monthly charge for wireless voice services as "network access," Sprint manipulated the system by classifying part of the charge as being in a category called "usage airtime: interstate," which was set up and used by Sprint to be non-taxable in New York.

68.     The taxing system's category for "usage airtime: interstate" was not set up to capture parts of a fixed periodic charge, but rather to capture per-minute usage charges – such as overage charges – that were for interstate calls.  The reference manual for the data system defined "usage (or airtime) charges" as "per minute charges for using a wireless network."  The portion of its fixed monthly charges that Sprint classified as "usage airtime: interstate" did not represent such per-minute usage charges.

69.     The taxing system's vendor considered charges for "usage airtime: interstate" (as the system defined it) to be non-taxable for purposes of New York state and local sales taxes and

set up the system to reflect that fact. Sprint knew of that non-taxable setting and did not change it, even though it knew that it was not using this category for its intended purpose.

### C.   Sprint's Allocations Between Taxable and Non-Taxable Categories Were Arbitrary

70.     The percentage figures that Sprint used in dividing up its fixed monthly charges for wireless voice services between the "network access" and "usage airtime: interstate" categories varied by calling plan and over time in an arbitrary and inconsistent manner.

71.     For its Sprint Spectrum plans, from July 2005 to October 2008, Sprint classified 28.5% of its fixed monthly charges for wireless voice services as "airtime usage: interstate." For its Nextel of New York plans, from about April 2006 through October 2008, it classified 13.7% as "airtime usage: interstate." For its Nextel Partners of Upstate New York plans, from about May 2006 to October 2008, Sprint represents, without support, that it classified 15% as "airtime usage: interstate." For all of its plans, since October 2008 until the present, it has classified 22.5% as "airtime usage: interstate."

72.     For example, Sprint would have applied New York sales taxes to a Sprint Spectrum plan with a $39.99 fixed monthly charge for access to Sprint's network for 450 minutes of calling time in August of 2006 as follows: It would have classified 28.5%, or $11.40, as "usage airtime: interstate" and not paid New York state and local sales taxes on it. It would have classified the remaining $28.59 as "network access" and paid taxes only on that part.

73.     In deciding to use these various percentages, Sprint did not apply values for the wireless network access it was providing to its New York customers, or any other customers around the country. It also did not apply values for the minutes that New York or other customers actually used for interstate calls or intrastate calls, or values for the minutes that were not used but were available under the plans.

74.    Instead, these allocations of Sprint's fixed monthly charges were arbitrary.  At times, for example, Sprint calculated a percentage for "interstate usage" from an unrelated federal telecommunications surcharge, but Sprint did not use that same percentage in calculating its obligations for that federal surcharge, nor did Sprint modify how it allocated its charges for sales tax purposes when the federal government changed the percentage.

75.    Even though Sprint has set up its system this way, it has not consistently adhered to its percentage allocations.  For some of its plans for certain periods of time, Sprint cannot tell what it taxed or why, and it lacks records reflecting its method of determining sales taxes in New York and elsewhere.  For example, Sprint lacks data that could show how it broke out its fixed monthly charges for voice services offered under plans sold by Nextel Partners (including plans sold by Nextel Partners of Upstate New York).

76.    Sprint also took action to conceal that it failed, at times, to apply its own percentage allocations as it intended.  It knew that disclosure would likely meet with resistance from taxing authorities nationwide and present the company with an increased nationwide audit risk.

77.     For example, by 2009, Sprint had discovered that, for certain plans sold around the country, including in New York, it had failed to break out its fixed monthly charges for wireless voice services and treat part as non-taxable.  In other words, Sprint discovered that it did not adhere completely to its own unbundling program, and therefore accidentally collected and paid the correct amount of sales taxes on a number of its plans.  As a result, Sprint collected and paid about $30 million in taxes from its customers around the nation that it had not intended to collect or pay.

78.     Once Sprint discovered this issue, employees not familiar with the nature of Sprint's unbundling suggested that Sprint seek a refund from taxing authorities of this $30 million "overpayment" on behalf of its customers.  This idea was promptly rejected by higher level Sprint tax employees who understood the importance of concealing both Sprint's unbundling practices and the state of its record keeping.  Sprint's Director of Telecom Tax wrote in an e-mail: "My 2 cents worth is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] - i.e., we can't change our books and records after the fact to support a refund."  Sprint's Senior State Tax Counsel then added to the discussion that "Sprint is already taking some risk with unbundling.  Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling."  After this internal consideration, Sprint did not seek refunds, nor did it notify consumers of the issue.

**IV.     Sprint's Avoidance of Over $100 Million in New York Sales Taxes**

79.     Sprint has not collected and paid state and local sales taxes required by New York law because it excluded about a quarter of its fixed monthly charges to New York customers for wireless voice services from its calculation of New York sales taxes.

80.     From July 2005 through the present day, Sprint has treated that excluded portion of the monthly charges as if it were not part of a fixed periodic charge for gaining access to Sprint's wireless network for a set number of minutes of calling time, which is what it was. Instead, Sprint inaccurately treated it as if it were a charge for per-minute usage for interstate calls and did not pay sales taxes on it in New York (and elsewhere) because per-minute usage charges for interstate calls are not subject to New York state and local sales taxes.

81.     Based on Sprint's approach, the three taxpayer defendant entities did not pay New York state and local sales taxes as follows:

a.      For flat-rate plans sold by defendant Sprint Spectrum L.P., Sprint did not collect or pay New York state and local sales taxes on 28.5% of its fixed monthly charges for wireless voice services, from July 2005 until October 2008.

b.      For flat-rate plans sold by defendant Nextel of New York, Inc., Sprint did not collect or pay New York state and local sales taxes on 13.7% of its fixed monthly charges for wireless voice services, from about April 2006 through October 2008.

c.      For flat-rate plans sold by defendant Nextel Partners of Upstate New York, Inc., Sprint did not collect or pay New York state and local sales taxes on an amount that Sprint cannot confirm, but has represented as being 15% of its fixed monthly charges for wireless voice services, from about May 2006 through October 2008.

d.      For flat-rate plans sold by all three of these companies, from October 2008 to the present, Sprint has not collected or paid New York state and local sales taxes on 22.5% of its fixed monthly charges for wireless voice services.

82.     As a result of Sprint's treatment of its fixed monthly charges for voice services, Sprint deprived New York state and local governments of more than $100 million of tax revenue.

83.     Under the New York Tax Law, such underpayments are also subject to interest, currently at an annual rate of 14.5%, and penalties of double the amount of fraudulent underpayments or up to 30% of other underpayments.

84.     The amounts of Sprint's under-collection and underpayment of taxes continues to grow.  Sprint still does not collect and pay New York state and local sales taxes on the full amount of its fixed monthly charges for voice services.

**V.      Sprint Knew It Was Violating Its New York Sales Tax Obligations**

85.      At the time Sprint made the decisions to unbundle its flat-rate plans and to treat a part of its fixed monthly charges for wireless voice services as non-taxable in New York, and at all times since, Sprint was fully aware of the New York Tax Law provisions concerning its obligation to pay sales taxes with respect to fixed monthly charges for wireless voice services.

86.      In 2002, when amendments to the New York Tax Law were under consideration with respect to telecommunications sales taxes, Sprint was part of an industry group that actively lobbied for the law to match its interests.  As part of these lobbying efforts, an internal lobbyist at Sprint, together with other industry representatives, met with representatives of the New York Tax Department shortly before the May 29, 2002 enactment of the amendments, in an effort to influence the legislation.

87.      In connection with these lobbying efforts, Sprint reviewed the pending legislation.

88.      Sprint's lobbyists were also in communication with the New York Tax Department concerning the guidance the Department issued just before the sales tax law amendments became effective.  An outside lobbyist for Sprint obtained a copy of the draft of the 2002 TSB-M from the New York Tax Department and then forwarded it to Sprint's internal lobbyist, who then forwarded it to the leaders of Sprint's internal State and Local Tax Group. According to the internal lobbyist, Sprint was being given an opportunity to comment on the TSB-M.  Sprint reviewed the draft of the 2002 TSB-M.  The draft was in all material respects the same as the final version of the 2002 TSB-M issued on July 30, 2002.

89.      By July 2005, when Sprint began to implement its decision not to pay New York sales taxes on the full amount of its fixed monthly charges to New York customers for wireless voice services, Sprint had reviewed New York sales tax law, including New York Tax Law

Sections 1105(b) and 1111(*l*).  Similarly, it made the decision only after reviewing the guidance from the New York Tax Department in the 2002 TSB-M.

90.     Sprint's Senior State and Local Tax Counsel, who was charged with understanding state and local tax law, when asked "how many times would you say you have read [the relevant New York tax law]," including Section 1105(b), testified "a hundred or more."

91.     Sprint did not seek, and has not sought, any guidance from the New York Tax Department about the application of the 2002 amendments or other New York law concerning sales taxes on the fixed monthly charges for wireless voice services or other bundled mobile telecommunications products.  It chose not to despite the fact that the New York Tax Department routinely provides such guidance to taxpayers and that Sprint has, in the past, consulted with the New York Tax Department on other tax matters.

92.     While it considered how to unbundle its flat-rate plans, Sprint did not seek or obtain any advice from outside attorneys or others outside the company with respect to its New York sales tax obligations concerning its fixed monthly charges for wireless voice services.

93.     Internally, Sprint did not prepare any memoranda or other documents analyzing these obligations.

94.     Sprint continues to not collect and pay New York state and local sales taxes on the full amount of its receipts from its fixed monthly charges for wireless voice services, despite being specifically informed of the illegality of this practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department.

**VI.**     **Sprint's Knowingly False Records and Statements**

95.     Sprint has repeatedly caused to be made false records and statements material to its obligations to collect and pay New York sales taxes on the full amount of the fixed monthly charges it received from New York customers for wireless voice services.

96.     Since it began its unbundling program, Sprint has submitted to the New York Tax Department each month tax forms – including Forms ST 809, ST 810 and Schedule T – that have purported to spell out the amount of sales taxes due to be paid by Sprint to the New York State and local governments.  The sales tax submissions are made separately for defendants Sprint Spectrum L.P., Nextel of New York, Inc. and Nextel Partners of Upstate New York, Inc.  All of these sales tax submissions are prepared and submitted centrally by employees of Sprint Nextel Corporation.

97.     Each and every one of the submitted tax forms, for all periods since Sprint began its unbundling program has been false in that not one states the accurate amount of sales taxes due.  Instead, these statements understate the taxes due because Sprint illegally and fraudulently failed to apply sales taxes to the part of its fixed monthly charges that it internally chose to classify as non-taxable "usage airtime: interstate" in its data systems.

98.     At the time Sprint submitted each of these tax forms and made these false statements as to each of the various taxing jurisdictions, it had actual knowledge of what was required by New York sales tax law, that it was not paying state and local sales taxes on its full fixed monthly charges for wireless voice services, and that such breaking out of the fixed monthly charges was not permitted under New York tax law.  Sprint thus knew that its repeated statements of the sales taxes it owed were false because they severely understated the tax due.

At a minimum, Sprint acted in deliberate ignorance of the truth or falsity of the information it included in its sales tax filings or it recklessly disregarded the truth or falsity of the information.

99. Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was material to the obligation of Sprint to pay the correct amount of sales taxes for the tax period represented by each filing.

100. Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was also material to Sprint's obligation to pay its total past underpayment of the sales taxes. Each filing continued to conceal (a) the existence of the underpayment in past periods, and (b) Sprint's ongoing and continuing conduct of submitting false tax filings. Each filing was a false record and statement that ensured that the taxing authorities of the state and local governments would not know of the underpayment and therefore would not seek to collect the moneys owed.

101. When Sprint made each of its New York sales tax filings and the separate representations in them for each taxing jurisdiction, Sprint made it less likely that the state or local governments would know about, or collect, or attempt to collect or receive any payment of Sprint's obligation to pay the total underpayment that had accumulated at that time.

## VII. Sprint Misled Its New York Customers That It Was Collecting and Paying All Applicable Sales Taxes

102. Sprint also misled its New York customers.

103. From July 2005 until the present, Sprint has had over three million customers in New York who purchased flat-rate calling plans. It currently has about 1.82 million such customers.

104.    These customers have entered into contracts with Sprint to purchase their plans, and they were locked into these plans for one or two years by early termination fees that Sprint would charge customers who terminated their plans before the contract period was over.

105.    In its contracts with these customers, on its website and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes on its calling plans.  As described above, however, it did not do so.  Sprint's representations in the contracts, on its website and elsewhere were false because Sprint knew it would not collect and pay the applicable sales taxes in New York.

106.    Contrary to its promises, Sprint failed to collect and pay sales taxes on substantial portions of the fixed monthly charges for voice services under its flat-rate calling plans.  As a result of this non-payment, Sprint left its New York customers liable for those unpaid amounts of sales taxes under New York law.

107.    At no point did Sprint disclose to its New York customers that it was leaving them liable for the sales taxes that Sprint failed to collect from the customers and pay to the government, as promised.

108.    Before Sprint began unbundling, members of its State and Local Tax Group and its marketing group considered in the early part of July 2005 whether to communicate with customers about the fact that Sprint was unbundling and that the unbundling would affect taxes for some customers.  They jointly opted not to communicate the change.  Sprint's Director of External Tax was concerned that disclosing the information would "drive too many calls" to Sprint's customer care division.

109.    In November 2005, just months after Sprint began unbundling, a Sprint employee in the Customer Billing Services department questioned a member of Sprint's State and Local

Tax Group about whether unbundling was "presented to the customer as part of the Subscriber agreement, shown in the invoice and/or available to Customer Care Rep."  The response was simply that "we have not educated our customers on how we are de-bundling transactions for their tax relief."

110.    Sprint continues to misinform its current and prospective customers about sales taxes, and to subject them to undisclosed sales tax liability even today.

## FIRST CAUSE OF ACTION

### New York False Claims Act – State Fin. Law § 189(1)(g)

111.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

112.    Defendants violated State Finance Law § 189(1)(g) in that they knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the state and local governments.

113.    The thresholds set forth in State Finance Law § 189(4)(i) and (ii) are satisfied because Sprint and the other defendants have net income or sales in excess of one million dollars for any taxable year subject to this action, and the damages pleaded exceed three hundred and fifty thousand dollars.

## SECOND CAUSE OF ACTION

### New York False Claims Act – State Fin. Law § 189(1)(c)

114.    Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

115.    Defendants violated State Finance Law § 189(1)(c) in that they conspired to commit a violation of State Finance Law § 189(1)(g).

116.     The thresholds set forth in State Finance Law § 189(4)(i) and (ii) are satisfied because Sprint and the other defendants have net income or sales in excess of one million dollars for any taxable year subject to this action, and the damages pleaded exceed three hundred and fifty thousand dollars.

## THIRD CAUSE OF ACTION

### Persistent Fraud or Illegality – Executive Law § 63(12)

117.     Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

118.     The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

119.     Specifically, as described in the foregoing paragraphs, defendant repeatedly engaged in the fraudulent and illegal acts of failing to collect and pay sales taxes due and owing and submitting false sales tax filings to the New York Department of Taxation & Finance in violation of New York State Tax Law § 1105, and as such is liable for the underpayment of taxes, interest thereon provided for in the New York Tax Law, and penalties provided for in the tax law, including, but not limited to, the penalties applicable where taxpayers fraudulently fail to pay taxes due.

## FOURTH CAUSE OF ACTION

### Violation of Article 28 of the Tax Law

120.     Plaintiff repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

121.     The acts and practices alleged herein constitute conduct proscribed by Article 28 of the Tax Law.  Defendants, who were required to collect sales taxes, failed to collect and pay over sales taxes, penalties and interest imposed by said Article.

122.     The Tax Commissioner has requested that the Attorney General bring or cause to be brought this action to enforce Article 28 against Sprint for the conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands and prays that judgment be entered against defendants Sprint Nextel Corp., Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York, Inc. as follow:

A.     Declaring, pursuant to CPLR § 3001, that defendants' practices and conduct have violated Tax Law § 1105, State Finance Law §187, *et seq*., and Executive Law § 63(12);

B.     Enjoining and restraining defendants from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above;

C.     Directing that defendants, pursuant to the New York False Claims Act, State Finance Law §§ 187, *et seq.,* pay an amount equal to three times the amount of damages sustained as a result of defendant's violations of the New York False Claims Act;

D.     Directing that defendants, pursuant to the State Finance Law §§ 187, *et seq.*, pay penalties of not less than $6,000 and not more than $12,000 for each violation of State Finance Law §189;

E.     Directing defendants to pay all damages caused by the fraudulent and deceptive acts and practices alleged herein, including all sales taxes due and owing, plus applicable interest

and penalties under the New York Tax Law, to all injured persons or entities, including those not identified at the time of the order;

F.      Restraining defendants from enforcing any early termination fee provisions in effect in their contracts with customers in New York;

G.      Awarding plaintiff costs of $2,000 against each defendant pursuant to CPLR § 8303(a)(6);

H.      Directing that defendants pay plaintiff's costs, including attorneys' fees as provided by law;

I.      Directing such other equitable relief as may be necessary to redress defendants' violation of New York law; and

J.      Granting such other and further relief as the Court deems just and proper.


DATED:      New York, New York
            April 19, 2012

                        **ERIC T. SCHNEIDERMAN**
                        Attorney General of the State of New York
                        Attorneys for Plaintiff


                        BY: _____
                                Randall M. Fox
                                 Bureau Chief
                                Emily Bradford
                                 Senior Counsel
                        Taxpayer Protection Bureau
                        Office of the New York Attorney General
                        120 Broadway, 25th Floor
                        New York, New York  10271
                        Tel:    (212) 416-6012
                        Fax:    (212) 416-6087